# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| **SIGNAL PEAK ENERGY, LLC,** | **Case No. CV-12-55-BLG-RFC** |
| **Plaintiff,** | |
| **vs.** | |
| | **ORDER RE:** |
| | **COUNTERCLAIM** |
| **EASTERN MONTANA MINERALS,** | **DEFENDANTS' MOTIONS TO** |
| **INC., and MUSSELSHELL** | **DISMISS AMENDED** |
| **RESOURCES, LLC,** | **COMPLAINT** |
| **Defendants and** | |
| **Counterclaim Plaintiffs,** | |
| **vs.** | |
| **SIGNAL PEAK ENERGY, LLC;** | |
| **FIRSTENERGY CORP.;** | |
| **FIRSTENERGY VENTURES CORP.;** | |
| **FIRSTENERGY GENERATION** | |
| **CORP.;  GROUP, LTD.; PINESDALE** | |
| **LLC; BOICH COMPANIES, LLC;** | |
| **WMB MARKETING VENTURES,** | |
| **LLC; GLOBAL COAL SALES GROUP,** | |
| **LLC; and GLOBAL MINING** | |
| **HOLDING COMPANY, LLC,** | |
| **Counterclaim Defendants.** | |

## I.   INTRODUCTION

This lawsuit arises out of a dispute over coal royalties paid by Plaintiff Signal Peak Energy, LLC ("SPE"), to Defendants Eastern Montana Minerals and Musselshell Resources (collectively, "EMM"), under a July 16, 2008 Coal Lease. SPE filed this action seeking a declaratory judgment that it is properly paying royalties to EMM based on the price paid by SPE's customer, Counterclaim Defendant First Energy Generation Corp. ("FGCO").  EMM believes the royalties it receives from SPE should be based on the resale price of the coal rather than the initial price paid by FGCO and has responded with counterclaims against SPE and associated companies (the "Counterclaim Defendants").

Pending before the Court are motions to dismiss filed by each of the Counterclaim Defendants.  Although EMM pleads plausible claims against SPE, EMM's claims against the other Counterclaim Defendants do not cross the threshold from speculative to plausible and must therefore be dismissed for failure to state a claim upon which relief may be granted.

## II.   FACTUAL BACKGROUND[1]

 In July of 2008, Defendant and Counterclaimant EMM (then Bull Mountain

---

[1]The following facts are taken from EMM's Amended Answer and Counterclaims (doc. 61).  Consistent with the standard of review for Rule 12 motions, the factual allegations in the pleading are presumed to be true.

Coal Properties) and Plaintiff and Counterclaim-Defendant SPE (then, Bull Mountain Coal Mining, Inc.) entered into the Coal and Coalbed Methane Lease and Water Rights Conveyance (the " Lease").  ¶¶ 16, 18-19.  In November of that year, the Coal Lease was amended to include Defendant and Counterclaim-Plaintiff MR.  The Coal Lease provides that SPE, as Lessee, will pay royalties to Lessor EMM based on all coal mined, shipped, and sold by SPE from the Signal Peak Mine (the "Mine") regardless of the buyer.  ¶ 21.  To allow EMM to benefit from future increases in the price of coal sold from the Mine, the Lease requires that royalties be calculated based on the "Gross Sales Price," that is the price received by SPE for coal sold in "arms' length transactions."  ¶ 22.  If the coal sales are made "in any manner other than at arms' length," the Lease requires that royalties be calculated at the price received in "comparable arms' length sales." *Id.*

When the Lease was executed, SPE was owned by Counterclaim-Defendant Global Mining Holding Company, Inc. ("Global Mining"), which was jointly owned by Counterclaim Defendants FirstEnergy Corp. ("FE") and Boich Companies, LLC ("Boich").  ¶ 20.

Around the same time SPE and EMM entered into the Lease, SPE and Counterclaim-Defendant FGCO, an affiliate of FE, entered into the Coal Sales

Agreement ("CSA").  ¶ 26.  The CSA is not a part of the Lease and does not

involve EMM.  ¶¶ 27-28.  When it executed the Lease, EMM expected that SPE

would sell coal to FGCO, but it did not expect that companies affiliated with SPE

would repurchase coal sold to FGCO and then resell the coal downstream at

higher prices in order to avoid paying EMM royalties on the higher prices.  ¶¶ 29-

30.  SPE has paid royalties, documented in monthly statements, to EMM since

2008 and has represented that all royalties were based entirely on coal sold to

FGCO under the CSA.  ¶ 31.  Although FE publicly acknowledges that

Counterclaim-Defendant Global Coal Sales Group ("GCSG"), an affiliate of SPE,

is the exclusive marketer of coal sold from the Mine, SPE has not told EMM that

coal sold to FGCO under the CSA is resold to GCSG and for further sale at higher

prices.  ¶ 32.

Around October, 2011, FE and Boich sold 1/3 of their interest in the Mine

to Counterclaim-Defendant Gunvor Group, Ltd. ("Gunvor"), through its subsidiary

Counterclaim-Defendant Pinesdale LLC ("Pinesdale").  ¶ 33.  Through this

transaction, FE and Boich transferred their interests in Global Mining, the

company that owns SPE and an affiliate of GCSG, to Counterclaim-Defendant

Global Holding, a holding company newly formed by FE and Boich.  *Id.*  SPE was

now owned by Global Holding, which was owned in equal parts by Gunvor,

through its subsidiary, Pinesdale, by FE, through its subsidiary Counterclaim-Defendant FirstEnergy Ventures Corp. ("FEV"), and by Boich, through its subsidiary Counterclaim-Defendant WMB Marketing Ventures, LLC ("WMB"). ¶ 34. Accordingly, the ownership structure following the Gunvor transaction is as follows:



Gunvor paid $400 million for its one-third interest in Global Holding, indicating SPE is worth more than $1 billion. ¶ 37. Since SPE is not worth over $1 billion if coal sales from the Mine are made only at the CSA prices, EMM believes Gunvor valued its interest in Global Holding based on SPE selling coal at higher prices. *Id.* After the Gunvor transaction the CSA was amended to significantly reduce the amount of coal sold thereunder. ¶ 38. Also after the

---

[2]Global Mining is the only one of these entities not named as a Counterclaim Defendant.

Gunvor transaction, FE issued a press release on its website stating that production at the Mine "is expected to rise to approximately 15 million clean tons per year from the current nine million tons, which can be sold to Gunvor as well as other domestic and international customers." ¶ 39.  Similarly, around the same time, Gunvor issued a press release announcing its $400 million investment in the Mine and stating that "[a]s part of the transaction, coal purchase agreements between Signal Peak and subsidiaries of each of First Energy and Gunvor were negotiated." ¶ 40.

Consistent with the amendment to the CSA after the Gunvor transaction, FE certified to the SEC in November 1, 2011 that "FGCO has revised its coal purchase agreement with Signal Peak to reduce delivery from up to 7.5 million tons annually to an obligation to accept up to 2 million tons each year." ¶ 41.  On November 3, 2011, Gunvor issued a press release noticing its "substantial coal purchase agreement with Signal Peal." ¶ 42.

Prior to the press releases and the Gunvor transaction, EMM had relied on SPE's assertions that all coal sold from the mine was sold to FGCO under the CSA for FGCO's own use or for resale to bona fide third parties.  ¶ 44.  But upon learning of the above press releases and the Gunvor transaction, EMM requested an audit of all coal sales from the Mine as it is authorized to do under the Lease.

6

¶¶ 43, 60.  SPE has refused to provide EMM with information regarding any coal buyers other than FGCO, any amendments to the CSA, and any documents relating to the Gunvor transaction.  ¶ 58.

> After EMM requested the audit, FE stated in SEC filings that:
>
> FGCO has a long-term coal supply agreement with Signal Peak for up to 10 million tons per year. FGCO has re-evaluated its coal usage under that agreement and has determined to resell its coal purchased from Signal Peak to an affiliate of Global Holding [GCSG], provided, however, that such affiliate [GCSG] may require FGCO to repurchase up to 2 million tons annually from the existing underground mines, and, if Signal Peak develops surface mines, it could require FGCO to purchase an additional 2 million tons per year.

¶ 45.  Based on the press releases and SEC filings, EMM alleges that Boich, FE, and Gunvor are channeling sales of coal from SPE through FGCO at the price set in the CSA, so that they can resell that coal back to GCSG (which, like SPE, is owned by Global Holding, and ultimately by the SPE Control Group (Gunvor, FE, and Boich)) at around the CSA price, who can resell the coal to Gunvor and others at higher prices.  ¶ 46.  This scheme allows the SPE Control Group to benefit from higher coal sale prices while paying royalties to EMM and taxes based on the lower CSA prices.  ¶ 47.  The SPE Control Group treats sales by SPE to GCSG and others as equivalent to sales by SPE directly into the market, except for royalty purposes, even though the EMM alleges the Lease requires they be treated

the same.  ¶ 48.

Section VI(C) of the Lease requires that royalties be paid on each ton of coal "mined, shipped and sold from the [Mine.]"  EMM argues that FGCO's purchase of coal under the CSA and the immediate resale to GCSG are purely paper transactions since SPE ships the coal directly to GCSG's purchasers, including Gunvor, FE, and sales on the open market.  ¶ 50.  Further, if GCSG is SPE's exclusive marketer, then the royalties to EMM should be based on the coal actually sold and shipped into the marketplace by GCSG in arms' length transactions, not based on the fabricated paper transactions through FGCO under the CSA. ¶ 52.

Rather, up to the time its Counterclaims were filed, EMM has received only royalties based on coal sold to FGCO under the CSA even though the coal is sold back to SPE's affiliate GCSG and then resold downstream at higher prices in arms' length transactions.  ¶ 53.  SPE maintains that it is only required to pay EMM royalties based on the sales under the CSA.  ¶ 57.

According to EMM, these practices are precisely the sort of non-arms' length transaction addressed by the Royalties provisions of the Lease.  ¶¶ 49, 54. At current production levels, every $1 change in the price of coal results in a difference of $720,000 in the amount of royalties owed to EMM. ¶ 56.  If

production increases to 15 million tons per year, as the Counterclaim Defendants have forecast, a $1 change in coal price results in a difference of $1,200,000 in royalties paid to EMM.  *Id.*

EMM has filed counterclaims for breach of contract (Count 1), bad faith (Count 2), actual fraud (Count 3), unjust enrichment (Count 5), civil conspiracy (Count 6), breach of fiduciary duty (Count 7), and punitive damages (Count 8) against SPE.  The other 9 Counterclaim Defendants, FE, FEV, FGCO, Gunvor, Pinesdale, Boich, WMB, GCSG, and Global Holding, are named along with SPE in Count 5 alleging unjust enrichment, Count 6 alleging civil conspiracy, and Count 8 alleging punitive damages.  The 9 are also named without SPE in Count 4 alleging tortious interference with contract.  EMM also seeks a declaratory judgment as to its rights under the Lease in Count 9.

All Counterclaim Defendants except SPE, FGCO, and GCSG challenge this court's jurisdiction over them and have accordingly moved to dismiss pursuant to Rule 12(b)(2) Fed.R.Civ.P.  In addition, all Counterclaim Defendants except SPE move the Court to dismiss the tort claims against them pursuant to Rule 12(b)(6) Fed.R.Civ.P. for failure to state plausible claims for relief.  Finally, SPE also moves to dismiss the actual fraud (Count 3), unjust enrichment (Count 5), civil conspiracy (Count 6), breach of fiduciary duty (Count 7), and punitive damages

(Count 8) claims for failure to state plausible claims for relief.  Doc. 85.  **III.**

**ANALYSIS**

**A.     12(b)(6) Motion to Dismiss for Failure to State a Claim**

A claim is subject to dismissal under Rule 12(b)(6) Fed.R.Civ.P. if it lacks a cognizable legal theory or if it fails to plead sufficient facts to state a claim for relief that is plausible on its face. *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1121-22 (9th Cir. 2008).  With respect to the latter, a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Plausible does not mean probable, but there must be more than a "sheer possibility" of unlawful action on the part of defendant. *Id.*

Although courts must presume the truth of well-pleaded factual allegations, this requirement does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Courts can therefore begin the Rule 12(b)(6) analysis by identifying allegations that are mere conclusions and

10

therefore not entitled to the presumption of truth.  *Iqbal,* 556 U.S. at 679.

"[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged–but it has not

shown–that the pleader is entitled to relief."  *Id.* (internal quotations omitted).

### 1.    Actual Fraud Against SPE

SPE argues in its motion to dismiss that EMM has failed to plead the fraud

allegations with particularity as required by Fed.R.Civ.P. 9(b) because it merely

relies on conclusory allegations unsupported by facts.  But as shown above in § II,

EMM makes fairly detailed factual allegations, with citations to documents

attached to its pleading, in its statement of facts.  *See* ¶¶ 16-60.  These allegations

make clear that EMM believes SPE has falsely represented it is paying EMM

royalties based on arms' length coal transactions, when it is actually paying

royalties based on paper transactions amongst a web of related entities designed to

reduce the amount of royalties paid, that SPE has made the false representations

and withheld information so that EMM would not challenge the royalty payments,

and that EMM reliance on SPE misrepresentations has resulted in EMM receiving

less royalties than it is entitled.  Moreover, paragraphs 84-93 succinctly

summarize these facts while tracking the elements of actual fraud.  Although

EMM's theory of fraud will crumble if SPE's actions are in accord with the Lease,

EMM has pleaded factual content, assumed to be true, that allows the Court to reasonably infer that SPE is liable for actual fraud  That is all that is required at this stage of the proceedings.  SPE's motion to dismiss the fraud claim must therefore be denied.

### 2.    Breach of Fiduciary Duty

EMM alleges that it "trusts and places special confidence in SPE to carry out its obligations under the Coal Lease in good faith, including paying Royalties to EMM based on all coal sold from the Mine, such that EMM may benefit from future increases in the price of coal" and that this special relationship means SPE owes a fiduciary duty to EMM.  ¶¶ 121-122.  EMM further alleges that SPE has breached its fiduciary duty, violated EMM's trust and confidence, and acted against EMM's interests by channeling coal sales through FGCO and GCSG to avoid paying Royalties to EMM based on arms' length transactions.  ¶¶ 123-125.  Finally, EMM alleges the breach of fiduciary duty has resulted in at least $1 million in damages to EMM.  ¶ 126.

SPE argues in its opening brief that Count 7 must be dismissed both because it does not owe EMM a fiduciary duty as a matter of law and because EMM has failed to allege sufficient facts to plead a plausible cause of action.  SPE did not address this claim in its reply brief.

Although the existence of a fiduciary duty is a question of law that can be resolved on summary judgment where there is no dispute as to the material facts, determining whether or not fiduciary relationship exists in cases such as this, where there is not ordinarily such a relationship, is a fact-intensive inquiry. *Gliko v. Permann*, 130 P.3d 155, 161 (Mont. 2006). Although EMM does not point the Court to any Montana cases imposing a fiduciary duty in the context of a royalty payment relationship, it cites persuasive authority indicating a fiduciary duty may be found where there is a special relationship beyond a bare royalty arrangement, such as where the royalty arrangement is part of an investment scheme. *Candelaria Industries v. Occidental Petroleum Corp*., 662 F.Supp. 1002, 1005 (D.Nev. 1984). Here, EMM alleges SPE was contractually required to pay SPE Royalties based on coal sold from the Mine in "arms' length transactions." Combined with the other detailed allegations in the Statement of Facts and the allegations in Count 7 that track the elements of the cause of action, EMM has alleged sufficient facts to state a plausible claim for relief.

### 3.    Count 5: Unjust Enrichment

A claim for unjust enrichment arises where a party "has and retains money which in justice and equity belongs to another." *Edwards v. Cascade County,* 212 P.3d 289, 295 (Mont. 2009). EMM's statement of facts plausibly alleges that SPE

is retaining money that it should be paying EMM pursuant to the Lease, but EMM

may not maintain an unjust enrichment claim against SPE because unjust

enrichment has its foundation in equity and is an obligation created by law in the

*absence* of a contract.  *Maxted v. Barrett,* 643 P.2d 1161, 1164 (Mont. 1982).

Accordingly, EMM does not object to the dismissal of the unjust enrichment claim

against SPE.  Doc. 91, p. 21, n. 6.

As to the remaining Counterclaim Defendants, it appears EMM's theory is

that because they are corporate relatives of SPE, they are unjustly enriching

themselves through their ownership of SPE.  But EMM's Statement of Facts

contains no specific allegations as to how any party but SPE is retaining money

owed to EMM.    In its response brief, EMM alleges:

> the SPE control-group [Gunvor, Boich, and FE], and its alter-ego
> subsidiaries and web of affiliates, have structured a complex scheme
> of transactions to retain portions of the Royalties owed to EMM.
> Consequently, the Counterclaim Defendants profit from this failure to
> pay EMM the full amount of Royalties which it bargained for and to
> which it is therefore entitled, by contract and in equity. The actions of
> each Counterclaim Defendant, either involving fraud, tortious
> interference, or unjust enrichment, are described in detail in the
> Counterclaims and in Sections I(B) and I(C), supra.

Doc. 91, p. 30.  As the Court understands this argument, EMM urges the Court to

treat the Counterclaim-Defendants as one big company.

14

But under Montana law, veil piercing is an "equitable remedy used to curb injustices resulting from the improper use of a corporate entity." *Hando v. PPG Industries, Inc.*, 771 P.2d 956, 960 (Mont. 1989).  In order to pierce SPE's liability shield, EMM must prove the corporate form was used to defeat public convenience, justify wrong, perpetrate fraud, or to defend crime. *Id.*  Here, there are no allegations that the corporate form of SPE was abused to damage EMM or render it immune from any judgment EMM may acquire against it.  SPE is the party that is allegedly failing to pay EMM and there is no allegation that SPE would be unable to pay a judgment entered in EMM's favor.  Forming subsidiaries to limit liability is not improper, there must be abuse of the corporate form resulting in injustice.  Without any specific allegations of wrongdoing on the part of the Counterclaim Defendants or any allegations they are using SPE's limited liability status to harm EMM, there can be no plausible claim for unjust enrichment.

### 4.    Tortious Interference Against Counterclaim Defendants

Under Montana law, a tortious interference with contract claim requires the claimant to establish that the defendant's acts: (1) were intentional and willful; (2) were calculated to cause damage to the claimant's business; (3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on

the part of the actor; and (4) that actual damages and loss resulted.  *Emmerson v. Walker*, 236 P.3d 598, 603 (Mont. 2010).  The tort of tortious interference requires proof of malice in the legal sense–that the defendant acted wrongfully, unlawfully, or without justification or excuse.  Such malice is not presumed and cannot be inferred from the commission of a lawful act.  *Taylor v. Anaconda Federal Credit Union*, 550 P.2d 151, 154 (Mont. 1976).  In order to succeed on a tortious interference claim, the plaintiff must show the actor intentionally committed a wrongful act without justification or excuse.  *Richland Nat. Bank & Trust v. Swenson*, 816 P.2d 1045 , 1051 (Mont. 1991).

FCGO is the first Counterclaim Defendant named in the tortious interference count.  The only allegedly tortious acts attributed to FCGO is that it willfully and intentionally resold coal purchased from SPE to affiliates of SPE.  ¶¶ 29-30, 32, 45-51, 96, and that it buys back some of the coal for its own use.  ¶ 51.  EMM further alleges FGCO made these sales in order to unlawfully damage EMM's business interests and that EMM has suffered damage as a result.  Significantly, EMM has made no allegations that selling coal lawfully purchased from SPE to others is wrongful.  This case is about the amount of royalty payments SPE pays to EMM and FGCO has no duty to pay royalties to EMM.  Without the allegation of any duty owed to EMM or relationship between FGCO

16

and EMM, there is no legally cognizable claim for tortious interference.

With respect to the "SPE Control Group," EMM alleges FE, Gunvor, and Boich "intentionally and willfully conducted business (including, but not limited to, structuring the Gunvor transaction) with the unlawful purpose of causing damage or loss with the unlawful purpose of causing damage or loss to EMM's business interests and contractual rights, including, but not limited to, EMM's contractual right to certain Royalties under the Coal Lease."  ¶ 99.  It further alleges the SPE Control Group's acts were calculated to damages EMM and that it is has been damaged by "not receiving the full amount of Royalties to which it is entitled."  ¶¶ 100-101.

First, although it mentions other damages to business interests, the only plausible damage to EMM is the loss of coal royalties from SPE.  If it is determined that SPE is properly paying EMM under the Lease, then all of EMM's claims fail.  Therefore, in order for the tortious interference claims to be plausible against a particular Counterclaim Defendant, EMM must allege that particular Counterclaim Defendant took actions that were calculated to, and did in fact, cause EMM to receive less royalty payments from SPE.  As to the specific allegation of wrongdoing in the claim itself, it is unclear how the structuring of the Gunvor transaction in and of itself reduced EMM's royalties since SPE could still have

paid royalties based on arms' length transactions.

Paragraphs 46-48 contain the only allegations of wrongdoing on the part of

the SPE Control Group:

> 46. Although the descriptions of the Gunvor Transaction in press
> releases and FE's SEC filings and its effect on SPE's coal sales are
> vague and inconsistent, since the Gunvor Transaction, it appears that
> Boich, FE and Gunvor have elected to (i) channel sales of coal from
> SPE through FGCO at the price set in the CSA, to (ii) resell the coal
> back to SPE's sister company, GCSG (also owned by Global
> Holding), also at or around the CSA prices, and to (iii) have GCSG
> resell the coal to Gunvor and other parties at higher prices.

> 47. This  complex scheme of transactions among inter-related entities,
> the details of which are unclear given the conflicting public
> statements, was designed to keep the benefit of coal sales at the
> higher prices within the SPE control-group, but to have SPE pay
> Royalties to EMM (and taxes) based on the lower CSA prices.

> 48. The various press releases and FE's SEC filings make clear that
> FE, Boich, and Gunvor treat sales by SPE to GCSG and downstream
> to the market as the equivalent of sales by SPE directly into the
> market, except for Royalty purposes. Under the Coal Lease, however,
> such sales should be treated the same for Royalty purposes also.

Essentially, EMM claims that since the SPE Control Group is at the top of

the corporate hierarchy and presumably where all the profits rest, that they are the

parties that orchestrated the scheme to pay royalties to EMM based on the price of

the coal sold to FGCO under the CSA, and then have FGCO sell the coal to SPE's

affiliate GCSG or Gunvor.  But without any specific factual allegation evidencing

18

that the SPE Control Group is directing SPE s to pay royalties based on the "paper transaction" to FGCO rather than based on the sale that places the coal into the market, the Court cannot infer more than the mere possibility of misconduct on the part of the SPE Control Group.  Again, EMM has alleged plausible wrongdoing on the part of SPE but its allegations of a conspiracy are thin and conclusory and insufficient to change this case from a dispute among contracting parties to a wide-ranging commercial tort case.

With respect to GCSG, EMM alleges that it has "intentionally and willfully conducted business (including, but not limited to, purchasing coal sold to FGCO under the CSA, and reselling such coal downstream at higher prices) with the unlawful purpose of causing damage or loss to EMM's business interests and contractual rights including, but not limited to, EMM's contractual rights to certain Royalties under the Coal Lease."  ¶ 102.  It is further alleged that GCSG's acts were calculated to damage EMM's business interests and that actual damage to EMM's business interests has resulted through the loss of royalties to which it is entitled.  ¶¶ 103-04.  Elsewhere in the Statement of Facts, EMM alleges GCSG is the exclusive marketer of coal sold from the Mine, ¶ 32, that it is an affiliate of SPE and a wholly-owned subsidiary of Global Holding, ¶ 35, which is owned by the SPE Control Group, ¶ 36.  Essentially, EMM alleges that GCSG is the entity

the SPE Control Group uses to buy coal cheap from FGCO and then resell for high prices so that SPE can avoid paying royalties to EMM based on those higher prices.  ¶¶ 46-49.

   But absent a duty on the part of GCSG to look out for EMM's interests or some way to hold GCSG liable for SPE's alleged wrongdoing, EMM has failed to allege anything other than competition in the coal market.  It is well-established that wrongdoing cannot be inferred from the doing of a lawful act.  *Taylor,* 550 P.2d at 154.  EMM therefore fails to allege a plausible claim for tortious interference on the part of GCSG.

   Paragraphs 105-107 relate to Global Holding, the holding company that indirectly owns SPE and directly owns GCSG, as well as Global Holding's immediate owners, Pinesdale, WMB, and FEV, which are owned by the SPE Control Group Gunvor, Boich, and FE, respectively.  EMM alleges Global Holding, Pinesdale, WMB, and FEV "intentionally and willfully conducted business (including, but not limited to, orchestrating coal sales through a chain of inter-related entities) with the unlawful purpose of causing damage or loss to EMM's business interests and contractual rights, including, but not limited to, EMM's contractual right to certain Royalties under the Coal Lease."  ¶ 105.  In the Statement of Facts, EMM further alleges that Gunvor used Pinesdale to purchase

its share of Global Holding from FE and Boich and that Pinesdale, WMB, and

FEV each own a one-third interest in Global Holding.   ¶ 34. But other than

conclusory allegations concerning these four Counterclaim Defendants within the

individual causes of action, *see* ¶¶ 111-12, 115, 118-19, 128-30, that is it.

*Iqbal* directs courts considering motions to dismiss to consider whether the

well-pleaded facts permit the court to infer more than the mere possibility of

misconduct.  If not, the complaint has only ***alleged*** an entitlement to relief and the

complaint must ***show*** the pleader is entitled to relief.  556 U.S. 662, 679 (2009).

Other than the conclusory allegation that Global Holding, Pinesdale, WMB, and

FEV orchestrated sales in order to damage EMM, EMM can't point to anything

these parties have actually done.  The only actual factual allegations relating to

these entities are that Gunvor used Pinesdale to purchase its share of Global

Holding from FE and Boich and that Pinesdale, WMB, and FEV each own a one-

third interest in Global Holding.  That is not enough to state a plausible claim for

tortious interference.

### 5.    Count 6: Civil Conspiracy

EMM's civil conspiracy claim repeats the same speculative allegations that

have already been found to fail to support plausible tort claims.  *See* ¶¶ 114-16.  It

would defy common sense for EMM to be able to multiply this dispute by bringing

21

in the other 9 Counterclaim Defendants simply because it alleges they conspired with SPE.  Disregarding the conclusory allegations and viewing the well-pleaded facts in the light most favorable to EMM, the Court cannot infer more than the mere possibility that these companies conspired with SPE to cheat EMM out of royalties.  *See Iqbal,* 556 U.S. at 678.  Accordingly, the civil conspiracy claim must also be dismissed.

### 6.    Punitive Damages

The only argument for dismissing the punitive damages claim alleged in Count 8 is that there is no underlying tort claim that survives the Counterclaim Defendants.  Since EMM has alleged plausible tort claims against SPE, the punitive damages claim against SPE also survives.

### B.    12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Having concluded that no plausible claims remain against Gunvor, Pinesdale, FE, FEV, Boich, WMB, Global Holding, FGCO, and GCSG, the Court need not consider whether Gunvor, Pinesdale, FE, FEV, Boich, WMB, and Global Holding should be dismissed pursuant to Rule 12(b)(2) for lack of personal jurisdiction.

### C.    DISMISSAL IS WITH PREJUDICE

The final question is whether dismissal should be with prejudice or whether

EMM should be granted leave to amend.  Factors to consider are undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of amendment. *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F.3d 1048, 1051 (9th Cir. 2003), *citing  Foman v. Davis,* 371 U.S. 178, 182 (1982).  Futility alone can justify the denial of leave to amend.  *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007).  And this Court's discretion to deny leave to amend is particularly broad where the complaint has already been amended.  *Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc*., 637 F.3d 1047, 1058 (9th Cir. 2011).

After EMM filed initial Counterclaims, all Counterclaim Defendants moved to dismiss for failure to state a claim and all but SPE, GCSG, and FGCO moved to dismiss for lack of personal jurisdiction, making the same arguments that are currently before the Court.  *See* docs. 36, 39, 41, 43, 45, 47, 49, 51, and 53. Despite being put on notice that its allegations were conclusory and that its basis for personal jurisdiction was tenuous against most Counterclaim Defendants and nonexistent against the others, EMM filed Amended Counterclaims (doc. 61) that were identical, save for the addition of WMB as a party.

More importantly, it is obvious that SPE is the party that has allegedly wronged EMM and that EMM's claims against the other Counterclaim Defendants are a fishing expedition.  If EMM could not flesh out its allegations after the first round of Rule 12 motions, there is little reason to believe it could do so now. Further, there is no claim that SPE would be unable to remedy its alleged underpayment of royalties or that it would be unable to obtain tort damages if EMM is successful on fraud, bad faith, and breach of fiduciary duty claims.  On the other hand, if it is determined that SPE did not violate the Lease, then all of EMM's tort claims would fail.  Under the circumstances, EMM need not be given leave to amend.

## IV.   ORDER

For those reasons, **IT IS ORDERED** that the Motions to Dismiss Amended Counterclaims brought by Gunvor Group Ltd. (doc. 67), Pinesdale LLC (doc. 69), Boich Companies, LLC (doc. 71), FirstEnergy Generation Corp. (doc. 73), FirstEnergy Corp. (doc. 75), FirstEnergy Ventures Corp. (doc. 77), Global Coal Sales Group, LLC (doc. 79), Global Mining Holding Company (doc. 81), and WMB Marketing Ventures, LLC (doc. 83) are **GRANTED.**  The Amended Counterclaims against these parties are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Signal Peak Energy, LLC's Motion to Dismiss Amended Counterclaims (doc. 85) is **GRANTED IN PART**: Count 5, alleging unjust enrichment, and Count 6, alleging civil conspiracy, are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Counterclaim Defendant's Motion for Protective Order staying all discovery (doc. 95) is **DENIED AS MOOT**.

Dated this 7th day of February, 2013.

*/s/ Richard F. Cebull*_____
Richard F. Cebull
United States District Judge

25